# United States Court of Appeals
## For the First Circuit

No. 03-1321

IN RE BANK OF NEW ENGLAND CORP.,

Debtor.

———————

HSBC BANK USA AND JPMORGAN CHASE BANK,
AS INDENTURE TRUSTEES,

Appellants,

v.

DR. BEN S. BRANCH, TRUSTEE IN BANKRUPTCY, ET AL.,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]
[Hon. William C. Hillman, U.S. Bankruptcy Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Smith,[*] District Judge.

Douglas B. Rosner, with whom Goulston & Storrs, Sarah L. Reid,
Joseph N. Froehlich, Kelley Drye & Warren LLP, David S. Rosner,

———————

[*]Of the District of Rhode Island, sitting by designation.

Daniel N. Zinman, and Kasowitz, Benson, Torres & Friedman LLP were on brief, for appellants.

Robin Russell, with whom Hugh M. Ray and Andrews Kurth LLP were on brief, for appellee Branch.

Patrick J. McLaughlin, with whom Katherine A. Constantine, Monica L. Clark, Dorsey & Whitney LLP, Dianne F. Coffino, and Dewey Ballantine LLP were on brief, for remaining appellees.

April 13, 2004

**SELYA**, __Circuit Judge__.  This is a case that straddles a crossroads formed by the intersection of federal and state law.  It requires us to decide an issue of first impression in this circuit regarding the enforceability in bankruptcy of agreements that allow the subordination of certain indebtedness.  Our decision partially contradicts the decision of the only other court of appeals to have grappled with this same set of questions, see Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.), 156 F.3d 1114 (11th Cir. 1998), and to that extent creates a circuit split.

The precise dispute between the parties focuses on the priority (if any) that attaches to payment of post-petition interest on indebtedness that benefits from the contractual subordination of other indebtedness.  As the question has been framed by the litigants and the lower courts, the answer depends on whether the subordination provisions at issue comply with the Rule of Explicitness.  So phrased, the question assumes the continued vitality of that rule.  Because we doubt the accuracy of that assumption, we step back to the beginning and inquire into the basis for believing that the Rule of Explicitness remains alive and well.

That step places us at the head of a long and winding path.  After traveling it, we conclude that the enactment of section 510(a) of the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549, 2586 (codified at 11 U.S.C. § 510(a)),

extinguished the Rule of Explicitness in its classic form. We further conclude that states are not free to adopt rules of contract interpretation that apply only in bankruptcy. For purposes of this case, then, the Rule of Explicitness is a dead letter.

Faced with this reality, we proceed to analyze the effect of the subordination provisions under New York's generally applicable principles of contract law — principles that do not embody any canon that operates in the same manner as the Rule of Explicitness. That analysis reveals an ambiguity in the language of the subordination provisions. The resolution of this ambiguity requires an inquiry into the parties' intent. That inquiry is fact-based and the bankruptcy court has not made the necessary findings. Consequently, we vacate the judgment below and remand for further proceedings.

## I.  BACKGROUND

The underlying facts are largely undisputed. In its halcyon days, the Bank of New England (BONE) issued six separate series of debt instruments.[1] Clearly worded choice of law provisions tie the construction and interpretation of these instruments to the law of New York. Three of these offerings (the Senior Debt) are entitled to the benefit of contractual

---

[1]Two of these were actually issued by BONE's predecessors in interest, but this technicality in no way affects our analysis. Thus, we disregard it.

subordination provisions. They include (i) a series of debentures bearing interest at 7.625% per annum, due in 1998, in the aggregate principal amount of $25,000,000; (ii) a series of debentures bearing interest at 8.85% per annum, due in 1999, in the aggregate principal amount of $20,000,000; and (iii) a series of notes bearing interest at a rate of 9.5% per annum, due in 1996, in the aggregate principal amount of $150,000,000. HSBC Bank USA and JPMorgan Chase Bank, appellants here, serve as Indenture Trustees for the Senior Debt. The remaining three offerings (the Junior Debt) are subordinated to the Senior Debt. They include (i) a series of floating rate debentures, due in 1996, in the aggregate principal amount of $75,000,000; (ii) a series of debentures bearing interest at 8.75% per annum, due in 1999, in the aggregate principal amount of $200,000,000; and (iii) a series of debentures bearing interest at 9.875% per annum, due in 1999, in the aggregate principal amount of $250,000,000. Each trust indenture referable to Junior Debt contains a subordination provision that is substantially similar to the following:

> [E]ach Holder likewise covenants and agrees by his acceptance thereof, that the obligations of the Company to make any payment on account of the principal of and interest on each and all of the Notes shall be subordinate and junior, to the extent and in the manner hereinafter set forth, in right of payment to the Company's obligations to the holders of Senior indebtedness of the Company.

Each of these indentures also specifies that:

> The Company agrees that upon . . . any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership, conservatorship or other proceedings, all principal (and premium, if any), sinking fund payments and interest due or to become due upon all Senior Indebtedness of the Company shall first be paid in full, or payment thereof provided for in money or money's worth in accordance with its terms, before any payment is made on account of the principal of or interest on the indebtedness evidenced by the [Junior] Notes due and owing at the time .
> . . .

On January 7, 1991, BONE filed a voluntary petition for bankruptcy. See 11 U.S.C. §§ 701-766. At that time, much of the Senior and Junior Debt was still outstanding. Everyone agrees that, in bankruptcy, the holders of the Senior Debt are contractually entitled to priority. Withal, the parties fiercely dispute whether that priority extends to the payment of post-petition interest.

Since filing for bankruptcy, BONE, under the careful stewardship of its Chapter 7 trustee, has made three distributions to creditors. Through these distributions, the bankruptcy estate has paid the holders of the Senior Debt the full amount of all unpaid principal and pre-petition interest, together with all approved fees and expenses incurred through the date of the last distribution (October 26, 1999). The trustee then created an ample

reserve for future fees and expenses and, at that point, concluded that he had satisfied the obligations owed to the holders of the Senior Debt. When, thereafter, the trustee determined that there existed sufficient unencumbered funds, he sought permission to make a distribution in the amount of $11,000,000 to the holders of the Junior Debt. The appellants objected on the ground that the trustee had not yet paid post-petition interest on the Senior Debt.

The bankruptcy court overruled this objection and authorized the proposed distribution. In re Bank of New Engl. Corp., 269 B.R. 82, 86 (Bankr. D. Mass. 2001). The court based its decision on the Rule of Explicitness, holding that New York law recognized the rule and that the language of the subordination provisions failed to satisfy it. Id. at 85-86. The district court affirmed. HSBC Bank USA v. Bank of New Engl. Corp. (In re Bank of New Engl. Corp.), 295 B.R. 419, 424-25 (D. Mass. 2003). The court's analysis differed somewhat from that of the bankruptcy court, but it too deemed the Rule of Explicitness controlling. Id. at 424. This appeal ensued.

## II. DISCUSSION

We cede no special deference to the district court's initial review of the bankruptcy court's decision. See Gannett v. Carp (In re Carp), 340 F.3d 15, 21 (1st Cir. 2003). Rather, we look directly to the bankruptcy court's decision, examining that court's findings of fact for clear error and its conclusions of law

-7-

de novo.  Id.  Insofar as the bankruptcy court's decision hinges on an interpretation of the Bankruptcy Code, it presents a question of law (and, thus, engenders de novo review).  United States v. Yellin (In re Weinstein), 272 F.3d 39, 42 (1st Cir. 2001).

As the litigants and the lower courts have framed the issue, the pivotal question is whether the language of the subordination provisions satisfies the Rule of Explicitness.  We do not agree that this is the correct question.  Thus, we retreat to first principles.

Subordination agreements are essentially inter-creditor arrangements.  4 Lawrence P. King et al., Collier on Bankruptcy ¶ 510.03[2], at 510-7 (15th rev. ed. 2003).  They are designed to operate in a wide range of contingencies, one of which is insolvency.  As a hedge against the ravages of a future bankruptcy, subordination agreements typically provide that one creditor will subordinate its claim against the debtor (the putative bankrupt) in favor of the claim of another creditor.  This subordination alters the normal priority of the junior creditor's claim so that it becomes eligible to receive a distribution only after the claims of the senior creditor have been satisfied.  Id. at ¶ 510.01, at 510-3.

Prior to 1978, the Bankruptcy Act contained no specific mention of subordination agreements.  See Alan N. Resnick & Brad Eric Scheler, The Right of a Senior Creditor to Receive Post-

Petition Interest from a Subordinated Creditor's Distributions: Did the Rule of Explicitness Survive the Enactment of the Bankruptcy Code?, 32 Uniform Comm. Code L.J. 466, 466 (2000). Accordingly, subordination provisions were enforced in bankruptcy through the bankruptcy court's equitable powers. See, e.g., Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortg. Corp.), 514 F.2d 400, 401-02 (2d Cir. 1975) (per curiam); Matter of Time Sales Fin. Corp., 491 F.2d 841, 844 (3d Cir. 1974); Bird & Sons Sales Corp. v. Tobin, 78 F.2d 371, 373 (8th Cir. 1935). Enforcing such agreements was necessary to prevent junior creditors from receiving windfalls after having explicitly agreed to accept less lucrative payment arrangements. See Matter of Credit Indus. Corp., 366 F.2d 402, 410 (2d Cir. 1966); In re Hinderliter Indus., Inc., 228 B.R. 848, 853 (Bankr. E.D. Tex. 1999). Equity dictated enforcement because "[e]quality among creditors who have lawfully bargained for different treatment is not equity but its opposite." Chem. Bank N.Y. Trust Co. v. Kheel, 369 F.2d 845, 848 (2d Cir. 1966).

Defining the outer limits of this equitable rule, especially with respect to post-petition interest, posed a thorny problem. Generally, the accrual of interest on an unsecured or undersecured claim stops upon the debtor's filing of a bankruptcy petition. See, e.g., Nicholas v. United States, 384 U.S. 678, 682 (1966); Sexton v. Dreyfus, 219 U.S. 339, 344 (1911); see also 11

U.S.C. § 502(b)(2); Bankruptcy Act of 1898, § 63(a). Yet, subordination agreements sometimes contain language that prioritizes (or, at least, arguably prioritizes) the payment of post-petition interest on senior indebtedness over any recovery on junior indebtedness. From the outset, courts have been uncomfortable with enforcing this type of prioritization for fear that cases would arise "where a senior creditor may potentially recover more under a subordination agreement than its allowable claim against the estate." 4 Collier on Bankruptcy, supra ¶ 510.03[3], at 510-8.

To ease this discomfiture, judges fashioned an equitable doctrine to deal with (and, essentially, limit) the prioritization of post-petition interest payments. See Resnick & Scheler, supra at 467-68. In its simplest form, this equitable doctrine, called the Rule of Explicitness, required that a subordination agreement show clearly "that the general rule that interest stops on the date of the filing of the petition is to be suspended." Time Sales, 491 F.2d at 844. Over time, this evolved into a requirement that only unequivocal language could overcome the generic bar on recovery of post-petition interest.

That was the state of the law when Congress enacted the Bankruptcy Code in 1978. Pub. L. No. 95-958, 92 Stat. 2549. Unlike the earlier Bankruptcy Act, the Code deals explicitly with subordination agreements. Section 510(a) provides that a

-10-

subordination agreement is enforceable in bankruptcy to the same extent as under "applicable nonbankruptcy law." 11 U.S.C. § 510(a). This statutory provision supplants the judge-made doctrine through which the courts previously had dealt with such agreements. Because equitable powers possessed by bankruptcy courts "must and can only be exercised within the confines of the Bankruptcy Code," Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988), the enactment of section 510(a) means that the enforcement of subordination provisions is no longer a matter committed to the bankruptcy courts' notions of what may (or may not) be equitable. First Fid. Bank v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.), 134 B.R. 528, 533 (Bankr. S.D.N.Y. 1991).

That Congress cabined the bankruptcy courts' equitable powers while providing an alternate means for preserving the viability of subordination agreements does not resolve the further question of whether the Rule of Explicitness, through some other medium, survived the enactment of section 510(a). To answer that query, we begin, as always, with the text of the relevant statute. See 229 Main St. Ltd. P'ship v. Mass. Dep't of Envtl. Prot. (In re 229 Main St. Ltd. P'ship), 262 F.3d 1, 5 (1st Cir. 2001). We are mindful, of course, that the language of an unambiguous statute normally determines its meaning. Id.

In terms, section 510(a) provides that a "subordination agreement is enforceable in a [bankruptcy] case . . . to the same

-11-

extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). It is clear beyond peradventure that the phrase "applicable nonbankruptcy law" can refer to either federal or state law. See Patterson v. Shumate, 504 U.S. 753, 757-59 (1992). Since the construction of private contracts is usually a matter committed to state law, Volt Info. Scis., Inc. v. Bd. of Trs., 489 U.S. 468, 474 (1989), the presumption is that state law will furnish the proper benchmark. That presumption is especially robust here because we can find no federal statute that might guide us in interpreting subordination agreements. Accord Southeast Banking, 158 F.3d at 1121.

Of course, it might be possible to argue for the use of federal common law in this context. But resort to a federal common law of contract enforcement ordinarily is justified only when required by a distinct national policy or interest. See Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 153 (2d Cir. 1968). The interpretation and enforcement of financial arrangements between private parties does not fill that bill. See Southeast Banking, 156 F.3d at 1121 n.8.

To be sure, there is an important federal interest in the uniform application of the bankruptcy law — but that interest will not suffice in this instance to justify resort to federal common law. By requiring that the enforceability of subordination agreements be subject to applicable nonbankruptcy law, Congress

determined that such agreements should be interpreted using non-uniform principles. It is not our province to second-guess this determination. To cinch matters, the Supreme Court has instructed us that in the absence of specific statutory provisions to the contrary, property interests should not be analyzed differently as a result of a party's involvement in a bankruptcy case. Butner v. United States, 440 U.S. 48, 55 (1979). We take this to mean that bankruptcy courts should only modify the usual state-law compendium of rights and remedies if and to the extent that such modifications are specifically authorized or directed by the Bankruptcy Code.

For these reasons, we conclude that the applicable nonbankruptcy law referred to in section 510(a) is state law (and, particularly, state contract law). Accord In re Best Prods. Co., 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994); 9E Am. Jur. 2d Bankr. § 3113 (2000). It follows inexorably that if the Rule of Explicitness retains any vitality, it does so only as part and parcel of state law. See 4 Collier on Bankruptcy, supra ¶ 510.03[3], at 510-9, 10 ("[T]he Rule of Explicitness cannot be found in the Code, but resort must be had to the state law governing the contractual subordination agreement."); see also Southeast Banking, 156 F.3d at 1124.

This brings us to the parameters of the authority delegated by section 510(a). One thing seems very clear: in keeping with the principle that bankruptcy is an area of distinct

-13-

federal competence, Congress has conferred on the federal courts the power to apply any and all generally applicable state rules of contract interpretation in construing subordination agreements. But section 510(a) does not vest in the states any power to make bankruptcy-specific rules: the statute's clear directive for the use of applicable nonbankruptcy law leaves no room for state legislatures or state courts to create special rules pertaining strictly and solely to bankruptcy matters. See In re Cross, 255 B.R. 25, 34 n.5 (Bankr. N.D. Ind. 2000); cf. Int'l Shoe Co. v. Pinkus, 278 U.S. 261, 265 (1929) (clarifying that states are not free to enact laws that interfere with federal bankruptcy law or that provide additional or auxiliary regulation with respect to bankruptcy matters).

Formulation of the bankruptcy law requires Congress carefully to balance competing considerations. That effort is manifest here. On the one hand, bankruptcy highly values equitable distribution that is in line with the priorities embodied in the Code itself. On the other hand, equity typically operates to enforce voluntarily bargained-for positions (some of which may contradict the Code's normal priorities). Section 510(a) encapsulates Congress's reconciliation of this conflict. A state's creation of a bankruptcy-only rule of enforcement would outstrip the authority that Congress conferred (and, thus, upset the

equilibrium that section 510(a) was designed to achieve).  We conclude, therefore, that such a course is not open to the states.

If the Rule of Explicitness is an interpretive principle unique to bankruptcy, it offends this principle.  See Ionosphere Clubs, 134 B.R. at 533 (suggesting that the old Rule of Explicitness cases may "be inconsistent with the Code's new mandate that subordination provisions be enforceable in bankruptcy to the same extent that they are enforceable under nonbankruptcy law").  A contrary holding — one that allowed a state to adopt a bankruptcy-only Rule of Explicitness — would require certain contractual provisions (those arguably entitling senior noteholders to the payment of interest becoming due at future dates) to achieve a heightened degree of clarity only if the effort to enforce them arose in bankruptcy rather than in some other context.  Such a holding would go well beyond the intended reach of section 510(a).

The short of it is that the enforceability of subordination agreements in bankruptcy must be judged by reference to generally applicable state contract law.  As it pertains here, this holding limits our consideration to the general principles of New York contract law.  If — and only if — the Rule of Explicitness is such a general principle can it be given effect in this case.

The New York courts do not appear to have developed any rules of interpretation that apply specifically to subordination agreements.  See Best Prods., 168 B.R. at 69-70; see also Finest

-15-

Invs. v. Sec. Trust Co., 468 N.Y.S.2d 256, 258 (N.Y. Sup. Ct. 1983) (applying generic rules of construction to subordination clause); cf. N.Y.U.C.C. § 1-209 off'l cmt. 4 (stating that the "enforcement of subordination agreements is largely left to supplementary principles under Section 1-103," which codifies the application of the general law of contracts). Moreover, reported decisions from the New York state courts reveal only a single mention of the Rule of Explicitness. See Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.), 710 N.E.2d 1083, 1084-88 (N.Y. 1999) (a case which, for reasons that we shortly shall explain, does not help our inquiry). Although we are in something of an epistemological quandary — it is always difficult to prove a negative — the near-total absence of authority is compelling proof that the Rule of Explicitness is not part of New York's general contract law.

The decision in Chemical Bank does not alter this conclusion. The opinion in that case was a response to a question certified by the United States Court of Appeals for the Eleventh Circuit. Faced with the issue we confront today, that is, whether a subordination provision permitted the payment of post-petition interest ahead of junior indebtedness, the Eleventh Circuit certified the following question to the New York Court of Appeals: "What, if any, language does New York law require in a subordination agreement to alert a junior creditor to its

-16-

assumption of the risk and burden of the senior creditor's post-petition interest?"  Southeast Banking, 156 F.3d at 1125.  In so doing, the Eleventh Circuit invited the state court to fashion a bankruptcy-specific rule — and it did so without any evidence that New York had incorporated anything resembling the Rule of Explicitness into its general law of contracts.

Having received the invitation, the New York Court of Appeals responded in kind.  The court recognized that it was being asked to determine if New York should adopt the Rule of Explicitness as a "guiding interpretive principle of State contract dispute resolution" in bankruptcy cases.  Chem. Bank, 710 N.E.2d at 1086.  The court proceeded to embrace the rule as a rule of construction applicable only in bankruptcy.  See id. at 1088 ("In accordance with the Rule of Explicitness, New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's post-petition interest demand.").  The specificity of the court's holding is apparent from its use of the term "post-petition interest" — a term of art applicable only in bankruptcy. We recognize that the Chemical Bank court was constrained by the Eleventh Circuit's statement of the certified question.  But this constraint does not alter the fact that, in its holding, Chemical Bank announced a bankruptcy-only principle.  Nothing in that decision persuades us that the Rule of

-17-

Explicitness is otherwise a part of the armamentarium of interpretive principles generally available to the courts under New York law.

This illustrates our area of disagreement with the Eleventh Circuit. As framed, the question that it put to the New York court was beyond that court's competence to answer. While a federal court must defer when the highest court of a state interprets the state's general contract law, see, e.g., Daigle v. Me. Med. Ctr., Inc., 14 F.3d 684, 689 (1st Cir. 1994), no such deference is due to a state court's importation of a bankruptcy-specific rule into its own jurisprudence.[2]

That ends this aspect of our inquiry. There is simply no reason to believe that the New York courts would apply the Rule of Explicitness outside the bankruptcy context. Accordingly, the Rule of Explicitness cannot hold sway. To find otherwise would do violence to the language of section 510(a) and set state and federal law on a collision course.

Let us be perfectly clear. If a state, as part of its general contract law, enunciates an interpretive principle that applies to subordination agreements generally (e.g., "construe all subordination provisions strictly and enforce them only if the

---

[2]Although state courts do have the power to interpret federal law, that is not what the New York Court of Appeals was asked to do. The Eleventh Circuit requested the New York court to enunciate a bankruptcy-specific principle of state law. See Southeast Banking, 156 F.3d at 1125-26.

-18-

intent to subordinate is, on a particular set of facts, super-clear"), that principle would be enforceable under section 510(a).[3] In that event, rejecting the prioritization of post-petition interest in the absence of explicit language would be consistent with the general law of the state. Such a situation would not pose the same problem as does a state rule that applies only in bankruptcy.

We acknowledge that this conclusion compels us to part ways with the Eleventh Circuit. We are always reluctant to foment a circuit split, but we have no principled alternative here. The Southeast Banking court invited the New York Court of Appeals to craft a special bankruptcy-only canon of contract interpretation. See 156 F.3d at 1125. In our view, that course of action misapprehends the reach and breadth of section 510(a).

We now proceed to apply New York's general principles of contract enforcement to the facts at hand. This exercise will allow us to ascertain the effect of the provisions at issue upon the post-petition interest priority claimed by the appellants. Typically, the first step is to determine whether the challenged

---

[3]We recognize that the source of such an interpretive principle may be a state statute, a canon of construction enunciated by the state courts, or a rule of equity consistently applied. A bankruptcy court's adoption and enforcement of a state equitable principle is not the exercise of the bankruptcy court's own equitable powers, but, rather, an application of state law (and, thus, is a proper exercise of the authority conferred by section 510(a)).

-19-

provisions are subordination agreements within the meaning of section 510(a).  4 Collier on Bankruptcy, supra ¶ 510.03[2], at 510-7.  That step is a formality here:  these are subordination clauses, pure and simple.

We next must determine the meaning and effect of the subordination provisions.  Initially, we ask whether the provisions are ambiguous with respect to the relative priority of the payment of post-petition interest on the Senior Debt.  This is a question of New York law.  See W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990).  The New York Court of Appeals has provided us with clear, if conventional, guidelines:

> Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish.  The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.  Form should not prevail over substance, and a sensible meaning of words should be sought.

William C. Atwater & Co. v. Panama R. Co., 159 N.E. 418, 419 (N.Y. 1927) (citations and internal quotation marks omitted).

We take it as a given that a contract is ambiguous when its provisions are susceptible of two or more reasonable interpretations.  See Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978); Yanuck v. Simon Paston & Sons Agency, Inc., 618

-20-

N.Y.S.2d 295, 296 (N.Y. Sup. Ct. 1994). That is the case here. Although each word, taken in isolation, may have a reasonably definite meaning, we must examine these words collectively. See Atwater, 159 N.E. at 419. When we do, ambiguity surfaces.

The pertinent language requires full payment of "interest due or to become due" upon the occurrence of a number of events (including bankruptcy, insolvency, receivership, conservatorship, or "other proceedings"). The meaning of "interest due or to become due" seems obvious in the context of, say, a municipal bond: upon the occurrence of a triggering event, interest that has been earned but is not yet due to be paid becomes entitled to a priority.[4] Thus, the application of this group of words in the context of most triggering events is fairly straightforward. But bankruptcy — an event specifically referenced in the subordination provisions — alters the equation. Bankruptcy provides a special system of legal rules that occupies the field upon the filing of a petition. One byproduct of this special set of rules is that all interest is considered due as of the filing date. See 11 U.S.C. §§ 101(5)(a), 502(b). Conversely, interest that normally would accrue after that date is generally not recoverable at all (at least, not recoverable from the debtor). See id. § 502(b)(2).

_____

[4]We provide an example. If interest accruing on a bond is paid every six months (e.g., February 1 and August 1) and a triggering event occurs on May 1, the contractual language provides that all interest earned from February 1 through May 1 is entitled to prioritization (even though that interest is not yet due).

-21-

These special rules cloud the meaning of the phrase "interest due or to become due." On the one hand, those words reasonably can be interpreted to apply only to triggering events outside of the bankruptcy context (where they have an unambiguous meaning). On the other hand, those words reasonably can be interpreted — as the appellants exhort — to apply to all triggering events, including bankruptcy. In that context, however, the words have no clear meaning and a court faces further ambiguity in trying to determine their contours. After all, in most cases the phrase "due or to become due" simply refers to unmatured interest. At the time of a bankruptcy filing, however, there is no unmatured interest, so the clause may be interpreted either to carry the same "nonbankruptcy" meaning throughout or to take on a bankruptcy-specific meaning (which would cover post-petition interest). Because each of these interpretations seems plausible, we believe that the subordination provisions — as they apply in bankruptcy — are ambiguous. Cf. Southeast Banking, 156 F.3d at 1124 (finding the phrase "paid in full" ambiguous in the context of bankruptcy proceedings).

In fine, we find the words "due or to become due" lacking in certitude as to whether they actually provide for the payment of post-petition interest on the Senior Debt prior to any payment referable to the Junior Debt. New York law requires that this amphiboly be resolved through a contextual examination of the

parties' intent, taking full account of the surrounding facts and circumstances. Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 178 (N.Y. Sup. Ct. 1995); Yanuck, 618 N.Y.S.2d at 296; Tobin v. Union News Co., 239 N.Y.S.2d 22, 25 (N.Y. Sup. Ct. 1963). Discerning this intent ordinarily requires the adjudication of factual questions. See Ruttenberg, 626 N.Y.S.2d at 175; Yanuck, 618 N.Y.S.2d at 296; see also Time Warner Entm't Co. v. Brustowsky, 634 N.Y.S.2d 82, 82 (N.Y. Sup. Ct. 1995) (noting that factfinding generally will be necessary if the contract term at issue is "susceptible to varying reasonable interpretations"). A trial can be avoided only if the parties' intent is made manifest within the four corners of the contract itself. Ruttenberg, 626 N.Y.S.2d at 175-76.

In the case at bar, it is impossible to glean the parties' intent from the language and structure of the instruments alone. These documents evidence complex commercial transactions, and the matter is further complicated because the beneficiaries of the subordination provisions — the holders of the Senior Debt — are not parties to the agreements containing the subordination provisions (those agreements are directly appurtenant to the Junior Debt). Given these realities, we are persuaded that resolution of the intent question cannot be accomplished by the simple expedient of examining the relevant paperwork, but, rather, requires

differential factfinding.[5]  Because the bankruptcy court has not yet developed a record with this inquiry in mind, we remand for factfinding on the parties' intent vis-à-vis post-petition interest.

## III. CONCLUSION

We need go no further.  We hold that the Rule of Explicitness has no application in the context of bankruptcy where, as here, the state has not adopted the rule as one of general applicability.  Consequently, we turn to generic principles of state law to interpret the contractual provisions at issue. Applying those principles, we find the subordination provisions ambiguous as to whether they provide for the priority payment of post-petition interest.  This finding necessitates an examination into the intent of the parties — an inquiry which, in the circumstances of this case, entails questions of fact that must in the first instance be addressed by the bankruptcy court.  We therefore vacate the decision of the district court and remand with instructions that the district court vacate the judgment of the

---

[5]To be sure, the backdrop of bankruptcy may inform the examination into the parties' intent.  See Dolman v. U.S. Trust Co., 157 N.Y.S.2d 537, 541-42 (N.Y. Sup. Ct. 1956) (noting the presumption "that the parties had [the law in force at the time of agreement] in contemplation when the contract was made," and that the contract generally will be "construed in light of such law"). Here, however, the effect of that tenet is uncertain absent further factfinding.  Cf. Time Warner Entm't, 634 N.Y.S.2d at 83 (finding a regulatory definition of a term not determinative of its meaning in a contract where proof was adduced indicating that the parties intended an independent meaning).

bankruptcy court and remand the matter to that tribunal for further proceedings consistent with this opinion.

**<u>Vacated and remanded</u>**.  **<u>All parties shall bear their own costs</u>**.