# United States Court of Appeals

## For the First Circuit

No. 10-1456

IN RE:  BANK OF NEW ENGLAND CORPORATION, DEBTOR

---

HSBC BANK USA, National Association,
as Indenture Trustee and as Successor Indenture Trustee
to JP Morgan Chase Bank, f/k/a The Chase Manhattan Bank,
as Indenture Trustee,

Appellant,

v.

BANK OF NEW YORK MELLON TRUST COMPANY, National Association,
as Indenture Trustee; U.S. BANK, National Association,
as Indenture Trustee; DR. BEN S. BRANCH, Chapter 7 Trustee
for Bank of New England Corporation,

Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Joseph L. Tauro,  U.S. District Judge]

---

Before

Torruella, Stahl and Howard,
Circuit Judges.

---

Charles J. Cooper with whom Michael W. Kirk, Jesse Panuccio, Sarah L. Reid, Alison L. MacGregor, Douglas B. Rosner, Cooper and Kirk, PLLC, Kelley Drye & Warren LLP, and Goulston & Storrs, P.C., were on brief for appellant.

Dianne F. Coffino for Bank of New York and Patrick J. McLaughlin for U.S. Bank with whom C. William Phillips, Robert M. Hemm, Katherine A. Constantine, Todd Pearson, Pamela Foohey, Covington & Burling LLP, and Dorsey & Whitney LLP were on brief for appellees.

———————————————

June 23, 2011

———————————————

**STAHL**, <u>**Circuit Judge**</u>. HSBC Bank USA, N.A. appeals, for the second time, a district court judgment that affirmed a bankruptcy court's authorization of a distribution of assets from the estate of Bank of New England Corporation ("BNEC") to holders of BNEC junior debt. The parties agree that the holders of the senior debt are entitled to priority payment of their principal along with pre-petition interest – that is, interest that accrued up until the filing of BNEC's bankruptcy petition – before the holders of the junior debt may receive a distribution. At issue is whether this senior priority also includes payment of post-petition interest earned on the principal up until the principal was paid in full, as HSBC contends. For the following reasons, we affirm.

## I.  Background

During the 1970s and 1980s, BNEC issued six series of unsecured debt instruments that totaled over $700 million in principal amount. Three of these offerings were issued in 1973, 1974, and 1986 and consist of senior, unsecured debt. The other three offerings were issued in 1984, 1987, and 1989 and consist of subordinated, or junior, unsecured debt. The holders of the senior debt ("Senior Noteholders") are represented by indenture trustee HSBC ("Senior Trustee"), and the holders of the junior debt ("Junior Noteholders") are represented by indenture trustees U.S. Bank, N.A. and Bank of New York Mellon Trust Company, N.A.

(collectively "Junior Trustees"). Choice of law clauses within the indentures state that New York law controls the debt instruments.

The three junior indentures that govern the junior debt contain virtually identical subordination provisions, as follows:

> The Company . . . covenants and agrees, and each Holder likewise covenants and agrees by his acceptance thereof, that the obligations of the Company to make any payment on account of the principal of and interest on each and all of the [Subordinated Notes] <u>shall be subordinate and junior, to the extent and in the manner hereinafter set forth</u>, in right of payment to the Company's obligations to the holders of Senior Indebtedness of the Company . . . .

(emphasis added). In turn, each junior indenture further details:

> The Company agrees that upon . . . any payment or distribution of assets of the Company of any kind or character . . . to creditors upon any dissolution or winding up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership, conservatorship or other proceedings, all principal (and premium, if any), sinking fund payments and <u>interest due or to become due</u> upon all Senior Indebtedness of the Company shall first be paid in full . . . before any payment is made on account of the principal of or interest on the indebtedness evidenced by the [Subordinated Notes] due and owing at the time . . . .

(emphasis added).

On January 7, 1991, BNEC filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code. Dr. Ben S. Branch was elected to serve as BNEC's Chapter 7 Trustee, and over time, he made three distributions that satisfied in full the Senior

Noteholders' principal and pre-petition interest due under the senior notes, along with approved fees and expenses incurred through the date of the third distribution. He also created a reserve to cover future fees and legal expenses.

After the third distribution, made in 1999, the Chapter 7 Trustee concluded that the estate had satisfied the claims of the Senior Noteholders, and so on May 23, 2001, he moved for authorization to make a fourth distribution, of $11 million, which would represent the first recovery by the Junior Noteholders.[1] The Senior Trustee objected, arguing that the Junior Noteholders were not entitled to receive any payment until the Senior Noteholders were paid post-petition interest.

The bankruptcy court granted the Chapter 7 Trustee's motion over the Senior Trustee's objection and authorized the distribution. In re Bank of New Eng. Corp., 269 B.R. 82 (Bankr. D. Mass. 2001) ("BNEC I"). It held that, in accordance with the Rule of Explicitness, as articulated in three court of appeals cases

_____

[1]The parties agree that although the motion concerns a distribution of $11 million, the resolution of this dispute will apply to the entire balance of the estate, which approximates $100 million.

during the 1970s[2] and as adhered to under New York law,[3] senior creditors can recover post-petition interest prior to a distribution to junior creditors only when the subordination agreement explicitly states the junior creditors' assumption of the risk for such payment. Id. at 85-86. It then found that the language within the junior indentures was not sufficiently explicit to meet this standard. The district court affirmed. HSBC Bank USA v. Bank of New Eng. Corp. (In re Bank of New Eng. Corp.), 295 B.R. 419 (D. Mass. 2003) ("BNEC II").

On appeal, we reversed. HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.), 364 F.3d 355 (1st Cir. 2004) ("BNEC III"). We explained that the accrual of interest on an unsecured claim stops when a debtor files a bankruptcy petition, such that post-petition interest "is generally not recoverable at all (at least, not recoverable from the debtor)." Id. at 362, 367; see also 11 U.S.C. § 502(b)(2). We also acknowledged that subordination agreements may sometimes prioritize the payment of post-petition interest to senior creditors over any recovery on junior indebtedness, entitling senior creditors to amounts that would

_____

[2]See Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. First Nat'l City Bank of N.Y. (In re King Res. Co.), 528 F.2d 789 (10th Cir. 1976); Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortg. Corp.), 514 F.2d 400 (2d Cir. 1975); In re Time Sales Fin. Corp., 491 F.2d 841 (3d Cir. 1974).

[3]The court relied on Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.), 156 F.3d 1114 (11th Cir. 1998), in reaching this conclusion.

-6-

otherwise be payable to junior creditors. <u>BNEC III</u>, 364 F.3d at 362. We noted that before the adoption of the Bankruptcy Code in 1978, the recovery of post-petition interest prior to any distribution to junior creditors was controlled by the Rule of Explicitness, an equitable doctrine fashioned by the courts that prohibited senior creditors from recovering post-petition interest absent unequivocal language in subordination agreements to the contrary. <u>Id.</u> We concluded, however, that the 1978 enactment of the Bankruptcy Code, and specifically § 510(a) therein, "extinguished the Rule of Explicitness in its classic form." <u>Id.</u> at 359.

In reaching our holding, we interpreted § 510(a), which states: "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). We explained that this section requires courts to reference general principles of state contract law when enforcing subordination agreements, and it prohibits states from creating bankruptcy-specific rules of contract interpretation. <u>Id.</u> at 359, 362, 364.

In view of § 510(a), we examined New York's general principles of contract law and found that they "do not embody any canon that operates in the same manner as the Rule of Explicitness." <u>Id.</u> at 360. Rather, we found that "New York courts do not appear to have developed any rules of interpretation that

apply specifically to subordination agreements," and that "the Rule of Explicitness is not part of New York's general contract law." Id. at 364-65.

We then applied New York contract law to determine the meaning of the subordination provisions within the junior indentures. Specifically, we examined whether the phrase "interest due or to become due," owed first to the Senior Noteholders, was meant to include post-petition interest. Id. at 366. Finding the phrase ambiguous, we remanded to the bankruptcy court to conduct a "contextual examination of the parties' intent, taking full account of the surrounding facts and circumstances." Id. at 366-68. We acknowledged that "the backdrop of bankruptcy may inform [this] examination," id. at 368 n.5, as we noted that New York law recognizes a "presumption that the parties had the law in force at the time of agreement in contemplation when the contract was made and that the contract generally will be construed in light of such law," id. (internal marks omitted) (citing Dolman v. U.S. Trust Co., 138 N.E.2d 784, 787 (N.Y. 1956)). We stated further, however, that "the effect of that tenet is uncertain absent further factfinding." Id.

On remand, the bankruptcy court bifurcated the proceedings and decided first that each party had the burden to establish its claim of entitlement to the disputed funds by a preponderance of the evidence, a holding that neither party

appealed. In re Bank of New Eng. Corp., 359 B.R. 384 (Bankr. D. Mass. 2007) ("BNEC IV"). It then conducted a three-day evidentiary hearing involving the testimony of several fact and expert witnesses and approximately 200 exhibits. In re Bank of New Eng. Corp., 404 B.R. 17, 26 (Bankr. D. Mass. 2009) ("BNEC V"). Upon evaluation of the witnesses, exhibits, and submissions of counsel, along with the backdrop of bankruptcy, the court concluded that the parties to the junior indentures did not intend to permit the holders of senior debt to receive post-petition interest prior to payment on the junior debt. Id. at 18-19, 39. The district court affirmed. In re Bank of New Eng. Corp., 426 B.R. 1 (D. Mass. 2010) ("BNEC VI").

On appeal, the Senior Trustee argues that the bankruptcy court must again be reversed. It asserts that the court looked to the incorrect law when analyzing the "backdrop of bankruptcy," and that it essentially found that New York law does include the Rule of Explicitness despite this court's opposite conclusion. It also argues that the court improperly analyzed the factual evidence presented in holding that the parties to the junior indentures did not intend to include post-petition interest. It claims, lastly, that because there was no competent extrinsic evidence to discern the parties' intent, the bankruptcy court should have construed the subordination agreements as a matter of law.

## II.  Analysis

We review directly a bankruptcy court decision and give "no special deference to the district court's determinations." Paging Network, Inc. v. Arch Wireless, Inc. (In re Arch Wireless, Inc.), 534 F.3d 76, 80 (1st Cir. 2008) (internal marks omitted) (quoting Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994)).  The bankruptcy court's conclusions of law are accorded de novo review, and its findings of fact are reviewed for clear error.  Id.; see also BNEC III, 364 F.3d at 361.  Findings of fact "are not to be disturbed if 'supportable on any reasonable view of the record,' viz., 'unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'" McMullen v. Sevigny (In re McMullen), 386 F.3d 320, 329 (1st Cir. 2004) (quoting Gannett v. Carp (In re Carp), 340 F.3d 15, 22 (1st Cir. 2003)).

As we explained in BNEC III, general principles of New York contract law must be applied to determine the meaning of the phrase "interest due or to become due" found within the junior indentures.  364 F.3d at 366-67.  Under New York law, a straightforward and unambiguous contract is to be interpreted as a matter of law, but "when the meaning of the contract is ambiguous," as we found the provisions to be, "the intent of the parties becomes a matter of inquiry, [and] a question of fact is presented."  Eden Music Corp. v. Times Square Music Publ'ns Co.,

-10-

514 N.Y.S.2d 3, 5 (N.Y. App. Div. 1987). In addition, courts may determine the meaning of ambiguous terms based on the law in force at the time the agreements are made, as "the law in force . . . becomes . . . part of the agreement . . . and the contract will be construed in the light of such law." Dolman, 138 N.E.2d at 787 (interpreting the term "condemnation" found within a lease agreement based on the New York City Administrative Code); see also Mayo v. Royal Ins. Co. of Am., 662 N.Y.S.2d 654 (N.Y. App. Div. 1997) (construing settlement stipulation not to allow recovery over $50,000 in view of state statutory limit).

The bankruptcy court sought to apply New York's law-in-force doctrine to the junior indenture agreements. It first stated that it considered this court's prior account of New York law, which we explained did not include a state-specific version of the Rule of Explicitness, to be dicta. BNEC V, 404 B.R. at 27. It then looked to determine the substantive law in effect at the time the agreements were executed, analyzing the common law of England, which New York adopted as its own common law, as related to insolvency proceedings. Id. at 28-29. The court concluded:

> Based upon this authority, I am convinced and hold that, under the law of New York, interest on an obligation ceases upon the filing of an insolvency proceeding of whatever nature by the obligor. This appears to have been the law of New York for so long that the memory of man runneth not to the contrary.

Id. at 29.

The Senior Trustee argues that the bankruptcy court erred by dismissing as dicta this court's previous conclusion that New York law does not include an analog to the Rule of Explicitness. It also claims that the bankruptcy court applied bankruptcy-specific New York (and English) law, rather than general principles of New York contract law. Lastly, it argues that, in reality, the bankruptcy court's holding did little to resolve the controversy because it simply concerned the obligations of the debtor in bankruptcy – namely, that a debtor is not responsible for paying post-petition interest (a principle of law neither side disputes) – and not the subordination rights of senior creditors as compared to junior creditors.

Although the bankruptcy court's law-in-force analysis appears somewhat contradictory at times, nonetheless we need not credit it, as, in the end, the discussion was unnecessary to the holding. As we explain below, the bankruptcy court's factual findings as to the intent of the parties were sufficient in themselves to support the conclusion that the parties did not intend to subordinate the Junior Noteholders to post-petition interest.

In accordance with New York law, the parties' intended meaning of an ambiguous term found in an agreement is to be "ascertained in the light of the surrounding facts and circumstances," Tobin v. Union News Co., 239 N.Y.S.2d 22, 25 (N.Y.

-12-

App. Div. 1963), based upon the "credibility of the extrinsic evidence or on a choice among reasonable inferences to be drawn from it," Williams v. Brosnahan, 746 N.Y.S.2d 219, 222 (N.Y. App. Div. 2002) (internal marks and citation omitted). A "'court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" Morgan Stanley Grp. Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275-76 (2d Cir. 2000) (quoting Alexander & Alexander Servs. Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998)). "The varieties of extrinsic evidence that may demonstrate circumstances surrounding formation of the contract are as limitless as are the types of circumstances." Margaret N. Kniffin, 5 Corbin on Contracts § 24.10 (Joseph M. Perillo, ed., rev. ed. 1998). Indeed, "dictionaries, treatises, articles, and other published materials created by strangers to the dispute . . . are . . . entirely appropriate for use in contract cases as interpretive aids." In re Envirodyne Indus. Inc., 29 F.3d 301, 305 (7th Cir. 1994) quoted in Corbin on Contracts § 24.10. Only if the extrinsic evidence supplied is conclusory or unable to resolve the ambiguity will the meaning of the term remain a question of law for the court. New York v. Home Indem. Co., 66 N.Y.2d 669, 671 (1985).

As stated above, we review a court's factual findings under the deferential clearly erroneous standard. See Anderson v. Bessemer City, 470 U.S. 564, 566 (1985). In deciding whether

factual findings are clearly erroneous, we "'must give due regard to the trial court's opportunity to judge the witnesses' credibility.'" Monahan v. Romney, 625 F.3d 42, 46 (1st Cir. 2010) (quoting Fed. R. Civ. P. 52(a)(6)). "Where there are 'two permissible views of the evidence,' the 'factfinder's choice between those competing views cannot be clearly erroneous.'" Id. (quoting Fed. Refinance Co. v. Klock, 352 F.3d 16, 26-27 (1st Cir. 2003)).

Here, the bankruptcy court engaged in substantial fact-finding and determined that the parties to the subordination agreements did not intend to subordinate the junior debt to post-petition interest accrued on the senior debt. Although the bankruptcy court acknowledged that no party actually involved in the drafting of the junior indentures was located to testify, the court relied on several other pieces of evidence to support its conclusion. See BNEC V, 404 B.R. at 26. The court heard direct testimonial evidence from John Cashin, the senior trust officer who headed the trust department at Chemical Bank Delaware, the original indenture trustee under the 1989 junior indenture, and who executed the 1989 junior indenture. See id. at 33. Although his function was only to comment on the duties of the trustee, he testified that it was the bank's position that Senior Noteholders would be entitled to "'interest and principal due to the senior holders up

-14-

to and including the petition, but not post-petition interest.'" Id. (quoting Cashin testimony).

The court also heard from the Junior Trustees' corporate trust expert, James Gadsden, a practicing attorney with thirty-four years of experience in the debt securities market and whose testimony "added substantially to the picture of what was going on in this field in the 1980 period." Id. at 37. Mr. Gadsden testified that participants in the debt securities market during the 1980s understood that a debtor's obligation to pay interest on unsecured debt ceased upon the filing of a bankruptcy petition, and that a junior creditor's subordination obligations were coextensive with that of the debtor's unless the subordination agreements explicitly stated otherwise. Id. at 37-38. He explained "'that you needed to convey to the person who was going to acquire the subordinated debt that the rule that interest on the senior indebtedness would cease on the bankruptcy case was not going to apply.'" Id. at 38 (quoting Gadsden testimony).

Gadsden also stated that, as an active participant in the American Bar Association's Business Bankruptcy Committee and Trust Indenture Subcommittee during the 1980s, he had been and was still familiar with the three court of appeals decisions from the 1970s that articulated the Rule of Explicitness. Id. at 37-38. Notwithstanding this court's conclusion that the Rule of Explicitness did not survive the 1978 enactment of the Bankruptcy

-15-

Code, Mr. Gadsden testified that, as a factual matter, those three cases were the only cases on point as to the construction of subordination articles at the time that the junior indentures were executed. As such, lawyers drafting indentures during the mid-1980s knew the cases and would take them into account when drafting subordination provisions. Id. at 38. He explained that those cases "'form[ed] the background against which people drafted indentures in the '80s. So they are . . . still part of what you have to analyze in understanding what people thought they would accomplish and would accomplish by a choice of words in the 1980s.'" Id. (quoting Gadsden testimony (emphasis in original)).

Additionally, Gilbert E. Matthews, an expert with forty years of experience in the investment banking industry and who was involved in the issuance of subordinated debt issues during the 1980s, testified to his opinion "that the investment banking community understood that senior debt was paid in full when it had received the amount owed as of the petition date." Id. at 36. Further, he stated that the market did not believe that typical subordination clauses like those in the junior indentures included post-petition interest, and "'post-petition interest was not payable, absent a specific provision that . . . permitted it.'" Id. (quoting Matthews testimony). With respect to the interests of the parties to a subordination agreement, Mr. Matthews noted that such parties, which typically include the issuer and the

-16-

underwriters and not a senior debt representative, generally have aligned interests because the issuing company has an incentive to make the terms favorable to junior debt so that the debt is more easily marketed and sold.

Beyond testimonial evidence, the bankruptcy court also considered documentary evidence supporting the Junior Trustees' position that specific language providing for post-petition interest was required in order to prioritize its recovery. For example, the court considered the 1983 American Bar Association Model Simplified Indenture, which was an update to its 1971 predecessor. The 1971 model was created before the three court of appeals decisions articulating the Rule of Explicitness, and it only entitled senior debt holders to "payment in full"; it did not include express language allowing for post-petition interest. See id. at 34. In 1983, however, the ABA published a new model indenture, put forward after the three court of appeals cases and the enactment of the Bankruptcy Code and around the time of the junior indentures. This model offered practitioners an example of the type of explicit language that would prioritize post-petition interest. Id. at 34-36.

The 1983 Model Simplified Indenture stated that in the event of bankruptcy or a similar proceeding, "holders of Senior Debt shall be entitled to receive payment in full in cash of the principal of and interest (including interest accruing after the

commencement of any such proceeding)" before other creditors are entitled to receive any payment. Id. at 35 (emphasis in original) (quoting Model Simplified Indenture § 11.03 (1983)). The notes accompanying the provision clarified further that the language used "specifies that priority in right of payment will extent to interest accruing on Senior Debt even after the commencement of a bankruptcy proceeding." Id. (emphasis added) (quoting Model Simplified Indenture § 11.03 cmt. 3). Mr. Gadsden, who studied the 1983 Model Simplified Indenture and then-market conditions when drafting the 1999 Revised Model Simplified Indenture, explained that at the time of the junior indentures, the market wanted senior noteholders to recover post-petition interest, and the 1983 model provided the type of express language required to permit its recovery. Id. at 38.

The bankruptcy court also reviewed a manual prepared in 1977 by attorneys at the law firm Davis Polk & Wardwell, LLP, which was counsel to the original indenture trustee under the 1984 and 1987 junior indentures and to the underwriters for the 1987 and 1989 junior indentures. See id. at 32. The manual, which remained unaltered through the 1980s even after the enactment of the Bankruptcy Code, demonstrated the law firm's understanding that explicit language was required in order to prioritize post-petition interest. The model contained a section entitled "Subordinated Issues" and discussed the three Rule of Explicitness circuit court

cases. Id. It explained that, in view of the circuit precedent, lawyers representing senior debt may wish to include specific language providing for post-petition interest recovery in order to "eliminate[] one obstacle to the senior creditor's right to post-petition interest." Id.; Davis Polk & Wardwell, LLP, Manual Regarding Matters to be Examined in Representing Morgan Guar. Trust Co. of N.Y. as Corporate Tr. of New Indentures 84-86 (1977). The bankruptcy court acknowledged that there was no evidence that anyone who drafted the junior indentures' subordination provisions relied upon the manual, but the manual did "suggest[] the existence of an institutional knowledge at Davis Polk with respect to the Rule of Explicitness." BNEC V, 404 B.R. at 32. Also presented to the bankruptcy court were scholarly articles published during the 1980s that corroborated the Junior Trustees' position regarding the need for explicit language to prioritize the recovery of post-petition interest.

To challenge this evidence, the Senior Trustee presented the testimony of only one expert, William H. Purcell, with forty years of experience in investment banking. Mr. Purcell analyzed forty-six indentures culled from 1984, 1987, and 1989, the years that the junior indentures were executed, and found three versions of subordination provisions: one utilizing express language like that in 1983 Model Simplified Indenture, one comparable to the junior indentures at issue in this case, and one comparable to the

1971 model that was silent on post-petition interest and simply required that senior debt be "paid in full" before any payment on the junior debt. He testified that, despite the different language used in these sample indentures, each guaranteed that senior noteholders were entitled to collect post-petition interest before junior noteholders received any payment. Id. at 35, 38-39. The bankruptcy court found this testimony "not credible" because it required the illogical conclusion that variances in language within indenture agreements were meaningless. Id. at 36, 39.[4]

In the end, the court relied on the testimony of several witnesses, both fact and expert, documentary evidence such as the 1983 Model Simplified Indenture and the Davis Polk manual, and contemporaneous scholarly articles in reaching the conclusion that the Junior Trustees proved by a preponderance of the evidence that the parties to the junior indentures did not intend to subordinate the junior notes to post-petition interest on the senior notes. In view of this evidence, which supports that bankruptcy court's conclusion, we find this holding reasonable and not clearly erroneous.

The Senior Trustee advances that the bankruptcy court committed legal error because it effectively applied the Rule of Explicitness by finding that explicit language was required to

_____

[4]Mr. Purcell also identified one indenture out of the forty-six that explicitly restricted the payment of post-petition interest.

-20-

prioritize post-petition interest. It also argues that the evidence presented was insufficient under New York's custom and practice doctrine to demonstrate a custom and practice of including explicit language within indenture agreements. We disagree. First, the bankruptcy court's factual analysis was not a backdoor application of the Rule of Explicitness. The court engaged in a comprehensive, fact-intensive inquiry into the parties' intent at the time of the agreements, not an application of a per se rule of construction. Second, we acknowledge that the bankruptcy court stated in a footnote at the very end of its opinion that "the Junior Trustees failed to demonstrate that including language which satisfies the Rule of Explicitness was part of the custom and practice in the investment banking industry in the 1980s." BNEC V, 404 B.R. at 39 n.149. We, however, do not take this to mean that the Junior Trustees failed to prove custom and practice. Rather, we understand this to simply recognize that not all subordination agreements during the 1980s included explicit language that provided for post-petition interest, such that not all of the agreements prioritized its recovery.

Third, in any event, even if the evidence presented did not satisfy the doctrine of custom and practice, a court evaluates a wide range of evidence when considering the surrounding facts and circumstances of an agreement to determine the parties' intent as to an ambiguous term, and it is not limited solely to the custom

-21-

and practice doctrine. See Morgan Stanley, 225 F.3d at 275-76; 5 Corbin on Contracts § 24.10; see also E.R. Squibb & Sons, Inc. v. Lloyd's & Co., 241 F.3d 154, 174-75 (2d Cir. 2001) (finding no clear error in district court's interpretation of an ambiguous contract provision that relied on expert testimony regarding a widely recognized industry standard despite some evidence arguably to the contrary); Evans v. Famous Music Corp., 807 N.E.2d 869, 873 (2004) (using multiple types of extrinsic evidence to interpret an ambiguous contract provision). Here, the court engaged in a multi-day trial full of fact and expert witness testimony and approximately 200 exhibits, and it used this array of evidence to reach its conclusion.

## III. Conclusion

For the following reasons, we affirm the district court's decision.

So ordered.