**U.S. BANK NATIONAL ASSOCIATION,**
**Plaintiff,**

v.

**T.D. BANK, N.A., Defendant.**

**16 Civ. 441 (DAB)**

United States District Court,
S.D. New York.

Signed January 27, 2017

Charles G. Frohman, Maslon LLP, Minneapolis, MN, Jessica Deborah Mikhailevich, Dorsey & Whitney LLP, Franklin Robert Ciaccio, Carter Ledyard & Milburn, LLP, New York, NY, for Plaintiff.

Lynn Katherine Neuner, Matthew Thomas O'Connor, Simpson Thacher & Bartlett LLP, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

DEBORAH A. BATTS, United States District Judge:

On January 20, 2016, U.S. Bank National Association ("U.S. Bank" or "Plaintiff" filed an action for declaratory judgment against T.D. Bank, N.A. ("T.D. Bank" or "Defendant"). This matter is now before the Court on the Parties' cross-Motions for Judgment on the Pleadings. For reasons that follow, Plaintiff's Motion is GRANTED in part and DENIED in part, Defen-

dant's Motion is DENIED in part and GRANTED in part, and the Complaint is DISMISSED in its entirety and on the merits.

## I. Background

Except where otherwise noted, the following undisputed facts are taken from the pleadings and documents incorporated therein.

### A. Bionol's Financing and Bankruptcy

This case involves the distribution of proceeds arising from the bankruptcy of a failed ethanol plant, Bionol Clearfield, LLC ("Bionol"). Bionol supported its operation and construction through secured debt financing, in which both Plaintiff and Defendant were lenders. (Compl. ¶¶ 4, 12.) Plaintiff filed this action seeking a declaration that, in accordance with the terms of a contract between the lenders, post-petition interest and fees are to be distributed before outstanding principal from the funds released from Bionol's bankrupt estate. (Id. ¶ 4.)

Plaintiff is the successor bond trustee to approximately $65 million in bonds issued by Pennsylvania Economic Development Financing Authority ("PEDFA") pursuant to an Indenture of Trust between PEDFA and Wells Fargo Bank, N.A., the original bond trustee. (Id. ¶ 13.) PEDFA loaned the proceeds of these bonds to Bionol under a Loan Agreement ("Tranche TEX Loan Agreement"), and assigned its payment and related collateral rights under the agreement to Plaintiff. (Id. ¶ 14.)

On February 6, 2008, Bionol entered into a Senior Credit Agreement ("Credit Agreement") covering five tranches of secured loans: Tranche A Loans, with $66,740,000 of principal outstanding; Tranche B Loans, with $34,650,000 of principal outstanding; the Working Capital Loans, with $3,199,102.40 of principal outstanding; Tranche TEX Loans, with $64,675,406 of principal outstanding; and Tranche C Loans, with $29,700,000 of principal outstanding. (Id. ¶ 15.) The Tranche TEX Loans are the loans funded under the Tranche TEX Loan Agreement and owing to Plaintiff, the sole lender under Tranche TEX. (Id. ¶ 12.)

Defendant is one of the lenders under Tranche A, Tranche B, and the Working Capital Loans. (Compl. ¶ 4; Ans. ¶ 4.) Defendant was also appointed Collateral Agent and Administrative Agent of the signatory lenders under the Credit Agreement. (Compl. ¶¶ 3, 18.)

On the same day that the Credit Agreement was executed, the Lenders also entered into an Intercreditor Agreement. (See Intercreditor Agreement ("IA"); Compl. Ex. E.) The Intercreditor Agreement assigns Defendant, in its capacity as Agent, the right to undertake enforcement actions with respect to the Lenders' pooled liens against Bionol's collateral. (Compl. ¶ 18.) Section 3.04(f) of the Intercreditor Agreement then provides an order of priority for the distribution of collateral proceeds among the Lenders. (Id. ¶ 21; Ans. ¶ 21.)

Under the Intercreditor Agreement, Tranche A Lenders, Tranche B Lenders, the Working Capital Lenders, and Tranche TEX Lenders are defined as Senior Lenders. (IA § 1.01.) The term "Financing Documents" is defined in the Credit Agreement as including, inter alia, both the Credit Agreement and the Intercreditor Agreement. (Credit Agreement ("CA") Ex. A at 18; Compl. Ex. D, part 2 at 64.)

Bionol filed for Chapter 7 bankruptcy on July 20, 2011. (Compl. ¶ 2.) In accordance with the Credit Agreement, Defendant, in its capacity as Agent, filed a proof of claim and attempted to recover on the collateral. (Id. ¶ 22.) On September 16, 2015, the Bankruptcy Court authorized Bionol's

Chapter 7 Trustee to release $10,561,452.93 of the collateral proceeds to Defendant. (Id. ¶¶ 3, 22.) The Parties expect another $14.4 million to be released to Defendant shortly. (Id. ¶ 23.) However, because the Parties cannot agree upon how the released funds should be allocated among the Lenders, Defendant has yet to distribute the proceeds. (Id.)

### B. The Governing Documents

The Parties agree that the Financing Documents govern the resolution of their priority dispute, but disagree as to the correct interpretation of the Documents. Specifically, both Parties agree that section 3.04(f) of the Intercreditor Agreement provides the relevant order of distribution for the proceeds released to Defendant.

Section 3.04(f) of the Intercreditor Agreement provides that proceeds received "upon the exercise of remedies (whether prior to or during the pendency of any Insolvency or Liquidation Proceeding)," are to be applied in the following order:

> (i) to pay Fees, costs and expenses then due and payable under the Financing Documents or the Tranche TEX Loan Documents (including the fees and expenses of the Bond Trustee[1] and any arbitrage rebate amounts due on the Bonds);
>
> . . .
>
> (iii) to pay any interest then due and payable to the Tranche A Lenders, Tranche B Lenders, Tranche TEX Lenders and Working Capital Lenders under the Financing Documents and the Tranche TEX Loan

Documents, as applicable, payable equally and ratably based upon the outstanding principal balances of the Working Capital Loans, the Tranche A Construction Loans, the Tranche B Construction Loans, and the Tranche TEX Loans;

> (iv) to pay any principal amounts due and payable with respect to all outstanding Tranche A Loans, the Tranche B Loans, the Tranche TEX Loans and Working Capital Loans in the amounts specified in the Credit Agreement; provided, that, such principal shall be paid in the following order of priority (in each of the following instances ratably and equally based on the outstanding principal balances of the relevant Loans); first, to the Tranche A Lenders; second, to the Tranche B Lenders; third, to the Working Capital Lenders, and fourth, to the Bond Trustee in respect of the Tranche TEX Loans;
>
> . . .

(IA § 3.04(f).) In turn, section 3.04(c) of the Credit Agreement provides that:

> Interest hereunder shall be due and payable[2] in accordance with the terms hereof, before and after judgment, regardless of whether an Insolvency or Liquidation Proceeding exists in respect of the Borrower,[3] and, to the fullest extent permitted by law, the Lenders shall be entitled to receive post-petition interest during the pendency of an Insolvency or Liquidation Proceeding.

(CA § 3.04(c).)

The Credit Agreement and the Intercreditor Agreement both include cross-re-

---

1. "Bond Trustee" is defined in the Credit Agreement as referring to Plaintiff. (CA Ex. A at 4.)

2. Section 3.04(a) of the Credit Agreement provides that, with respect to the Tranche TEX debt, interest is "payable" on each Quarterly

Payment Date, defined as four separate dates annually. (See CA § 3.04(a); CA Ex. A at 34.)

3. "Borrower" is defined in the Credit Agreement as referring to Bionol. (CA Ex. A at 4.)

ferential principles of interpretation. For example, section 1.01 of the Intercreditor Agreement provides that the "rules of interpretation contained in Section 1.02 to the Senior Credit Agreement shall apply to this Agreement," IA § 1.01; section 1.02 of the Credit Agreement similarly provides that "terms for which meanings are provided in this Agreement shall have the same meanings when used in each other Financing Document." (CA § 1.02.)

The "Basic Agreement" of the Parties is set forth in section 2.01 of the Intercreditor Agreement:

> [T]hat the proceeds of the Collateral and all other revenues . . . which are available for the payment of the Obligations due and payable at any time to the Lenders are . . . to be distributed to each of the Lenders as provided in the Accounts Agreement and herein.[4]

(IA § 2.02; Comp. Ex. E.) "Obligations" is defined in the Credit Agreement as including

> interest and fees that accrue after the commencement by or against the Borrower of any Insolvency or Liquidation proceeding naming the Borrower as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, pursuant to the terms of this Agreement or any of the other Financing Documents.

(CA Ex. A at 27.)

C. The Parties' Arguments

Plaintiff claims that the Financing Documents, read together, clearly provide for the distribution of post-petition interest to the Lenders before repayment of principal. (See Pl.'s Motion for Judgment on the Pleadings ("MJP") at 11.) Plaintiff bases its argument on section 3.04(f) of the Intercreditor Agreement, which prioritizes the repayment of "interest then due and payable" before the repayment of principal; by operation of 3.04(c) of the Credit Agreement—and the interpretive principles common to both documents—Plaintiff argues that "due and payable" interest explicitly includes interest that accrues during the pendency of Bionol's insolvency proceeding, including post-petition interest. (Id. at 14.)

Plaintiff claims that this conclusion is reinforced by the definition of "Obligations" in the Credit Agreement, which is made part of the Parties' "Basic Agreement" and includes interest accruing after the commencement of an insolvency proceeding, regardless of whether such interest would be allowable as a claim in the proceeding. (Id. at 11–13.) An adoption of Plaintiff's interpretation would result in a distribution of post-petition interest on a pro-rata basis to all eligible Lenders, of which Plaintiff would be entitled to 38%. (Compl. ¶ 44.)

Defendant argues that the Documents do not authorize the distribution of post-petition interest because, inter alia, interest is only "due and payable" under the Credit Agreement "to the fullest extent permitted by law," and bankruptcy law would not permit the payment of post-petition interest here. (Def.'s MJP at 10–

---

4. On December 8, 2016, the Court ordered the Parties to submit the Accounts Agreement along with "any other Contract between the Parties relevant to this dispute." (Dec. 8, 2016 Order; ECF No. 26.) The Parties submitted the Accounts Agreement and represented that "there are no contracts in addition to those provided . . . that are necessary for the Court to consider in deciding the parties' pending cross-motions." (Dec. 13, 2016 Joint Letter; ECF No. 27.) With respect to the order of distribution at the center of this dispute, section 17.04 of the Accounts Agreement simply provides that "the proceeds . . . shall be applied in accordance with Section 3.04(f) of the Senior Intercreditor Agreement." (Accounts Agreement § 17.04; Dec. 13, 2016 Joint Letter Ex. A.)

11.) In addition, Defendant claims that the Rule of Explicitness—a rule originating in bankruptcy law that requires post-petition interest provisions to be unequivocal before they are enforced—applies not only as a bankruptcy principle, but as a principle of New York contract law, and that the Documents here do not satisfy it.[5] (Id. at 12–13.) Although Plaintiff disputes that the Rule of Explicitness applies, it argues that even if it does, the Documents are sufficiently explicit. (Pl.'s MJP at 26–27.)

Defendant claims that it cannot disburse post-petition interest to the Lenders, and that the proceeds instead must be distributed in accordance with the order of priority set forth in section 3.04(f)(iv) of the Intercreditor Agreement. (Ans. ¶ 52.) Under Defendant's interpretation, Tranche A Lenders would be entitled to 100% of the distribution, and Plaintiff would be entitled to none. (See Compl. ¶4; Ans. ¶ 28.)

## II. Discussion

### A. Legal Standards for Judgment on the Pleadings

Faced with cross-motions pursuant to Rule 12(c), "[j]udgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Steadfast Ins. Co. v. Stroock & Stroock & Lavan LLP, 277 F.Supp.2d 245, 250 (S.D.N.Y. 2003). Accordingly, to grant a Rule 12(c) motion, a movant must establish " 'that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law.' " Mack v. Comm'r of Soc. Sec., No. 12 Civ. 186, 2013 WL 5425730, at *6 (S.D.N.Y. Sept. 27, 2013) (quoting Juster

Assocs. v. City of Rutland, 901 F.2d 266, 269 (2d Cir. 1990)).

In deciding a motion to dismiss pursuant to Rule 12(c), a court applies the familiar standard applicable to a Rule 12(b)(6) motion. Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010). For a complaint to survive a Rule 12 motion, the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> [W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 556–57, 127 S.Ct. 1955). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotation marks omitted). "In keeping with these principles," the Supreme Court has stated,

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled

---

**5.** Section 10.02 of the Credit Agreement provides that the Documents are governed by New York law. (CA § 10.02.)

to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679, 129 S.Ct. 1937. The Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937, which, like the complaint's "labels and conclusions," are disregarded. Twombly, 550 U.S. at 555, 127 S.Ct. 1955. Nor should a court "accept as true a legal conclusion couched as a factual allegation." Id.

On a Rule 12(c) motion, a court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009). A court may also review any document incorporated by reference in the pleadings or integral to the complaint. Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).

## B. Rule of Explicitness

One of the central disputes in this case is the applicability of the Rule of Explicitness. To give context to the Parties' positions, a brief history of the Rule is required.

The Rule of Explicitness arose in response to "[t]he general rule in bankruptcy ... that interest on debtors' obligations ceases to accrue at the beginning of the proceedings." In re Ionosphere Clubs, Inc., 134 B.R. 528, 531 (Bankr. S.D.N.Y. 1991) (internal quotation marks omitted). This principle is codified at section 502(b)(2) of the Bankruptcy Code, which disallows claims for post-petition interest, with limited exceptions.[6] 11 U.S.C. § 502(b)(2); see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 372–73, 379, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

In order to avoid operation of the general rule, bankruptcy courts began to require that agreements "clearly show" an intent to suspend the rule among the contracting parties; otherwise, "a right to 'post-petition' interest and a concomitant reduction in dividends to subordinated creditors" would not be recognized. In re Kingsboro Mort. Corp. ("Kingsboro I"), 379 F.Supp. 227, 231 (S.D.N.Y. 1974) (quoting In re Time Sales Finance Corp., 491 F.2d 841, 844 (3d Cir. 1974)), aff'd, In re Kingsboro Mort. Corp. ("Kingsboro II"), 514 F.2d 400 (2d Cir. 1975). Courts anointed this the "rule of explicitness." Kingsboro I, 379 F.Supp. at 231 (quotation marks omitted).

The Rule of Explicitness was developed by courts interpreting subordination agreements in the context of the Bankruptcy Act, which did not specifically address contractual subordination; when the Bankruptcy Code superseded the Act and enacted an express provision regarding subordination, the analysis became slightly refashioned. See In re K.-V. Discovery Solutions, Inc., 496 B.R. 330, 336 (Bankr. S.D.N.Y. 2013). The Bankruptcy Code

**6.** Post-petition interest may be recovered where the creditor is oversecured, see 11 U.S.C. § 506(b), or where the debtor is able to pay its other debts. See 11 U.S.C. § 726(a)(5).

provides that subordination agreements are "enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). Because subordination agreements were previously enforced pursuant to courts' equitable powers in bankruptcy, this new provision resulted in some confusion about the status of pre-Code cases applying the Rule of Explicitness to subordination agreements. See Ionosphere, 134 B.R. at 533.

At least one district court case in this Circuit, Ionosphere, affirmed the Rule's continuing vitality post-code, albeit without exploring how the common law Rule might be reconciled with the new statutory language. See id. at 534. However, faced with a similar issue, the 11th Circuit in In re Southeast Banking Corporation held that section 510 of the Code had abrogated the Rule of Explicitness, at least in its pre-Code form. In re Southeast Banking Corp. ("Southeast I"), 156 F.3d 1114, 1123–24 (11th Cir. 1998). The Eleventh Circuit instead found that the phrase "applicable nonbankruptcy law," within the meaning of section 510, required it to look to the state contract law governing the parties' agreement, which was—in that case as in this—New York state contract law. Accordingly, the circuit court certified to the New York Court of Appeals the question of what language New York law would require of an agreement attempting to subordinate debt to superior post-petition interest demands.[7] Id. at 1125. The New York Court of Appeals answered this question by adopting the Rule of Explicitness as a substantive principle of New York contract law. See In re Southeast Banking Corp. ("Southeast II"), 93 N.Y.2d 178, 688 N.Y.S.2d 484, 710 N.E.2d 1083 (1999).

The First Circuit took a different approach. In In re Bank of New England Corporation, it held that the New York Court of Appeals had exceeded its authority in creating what the First Circuit deemed a "bankruptcy-specific rule." 364 F.3d 355, 365 (1st Cir. 2004). In doing so, the First Circuit held, the New York Court of Appeals had subverted section 510's directive to apply nonbankruptcy law, and had encroached impermissibly into an area occupied by federal bankruptcy law. Id. at 364. Because of this, the First Circuit refused to apply the Southeast II holding to the interpretation of a subordination agreement under New York law, and instead relied on generally-applicable principles of New York contract law. Id. at 366. Paradoxically, when an application of these principles led to a later examination of the parties' intent, the court found that, due to the parties' practical reliance on the Rule of Explicitness, the agreement was insufficiently explicit to reflect an intent to provide for post-petition interest. See In re Bank of New England Corp., 646 F.3d 90, 97 (1st Cir. 2011).

### III. Application

#### A. Applicability of the Rule of Explicitness

█ The Parties disagree about whether the Rule of Explicitness has any application to the instant controversy. And, while useful by way of background, the above discussion does not resolve their dispute. Indeed, the Court has been unable to find any case discussing the applicability of the Rule of Explicitness in a non-bankruptcy proceeding.

The Second Circuit has yet to rule on the exact issue considered by the Eleventh and First Circuits—that is, whether defer-

**7.** The exact certified question was: "What, if any, language does New York law require in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest?" Southeast I, 156 F.3d at 1125.

ence to the New York Court of Appeal's ruling in Southeast II is appropriate in the context of a section 510 analysis. Nonetheless, the resolution of this issue has no direct bearing on the instant dispute: Although this case indeed involves the distribution of funds derived from an insolvent source, this is not a bankruptcy proceeding, no party before the Court is in bankruptcy, and the disputed funds are no longer part of Bionol's bankruptcy estate. Thus, the Court is not required to interpret a subordination agreement under section 510 of the Bankruptcy Code or to determine whether Plaintiff's demand for post-petition interest would be allowable as a claim in bankruptcy. Instead, in interpreting the Parties' agreement, the Court is instructed to look to New York contract law.

In Southeast II, the New York Court of Appeals adopted "its version of the Rule of Explicitness as a guiding interpretive principle of State contract dispute resolution." 93 N.Y.2d at 183, 688 N.Y.S.2d 484, 710 N.E.2d 1083. Underlying its decision were considerations for the significance of maintaining "definiteness and predictability" in commercial law, the Rule's "continued vitality" even post-Code, and the heavy "practical effect" a contrary ruling would have on the "vast sea of subordination agreements" drafted in express reliance on the Rule. Id. at 184, 688 N.Y.S.2d 484, 710 N.E.2d 1083. Repeatedly referring to the question before it as one of "New York contract law," the Court of Appeals also analogized its adoption of the Rule to the standard of explicitness that New York law has long required of post-assignment interest provisions in common law assignments for the benefit of creditors. Id. at 186, 688 N.Y.S.2d 484, 710 N.E.2d 1083. This Court thus accepts what the Southeast II decision made plain: that the Rule of Explicitness is now not only a bankrupt-

cy rule, but an interpretative principle of New York state contract law.

Indeed, although the section 510 source-of-law question is not present here, the Court notes that this case presents a clear example of how the Southeast II ruling may apply in a nonbankruptcy proceeding, thus avoiding the federal conflict issues identified by the First Circuit in New England Bank. And while the impact of Southeast II may remain uncertain in the bankruptcy context, the clarity which with the New York Court of Appeals adopted the Rule as a concept of substantive contract law leaves little room for doubt. Thus, both Parties here are at least partly correct: Plaintiff is correct that bankruptcy law has no direct application in this case, and Defendant is correct that under Southeast II, the Rule is no longer strictly confined to bankruptcy proceedings.

Plaintiff argues that even if the Rule applies, it does not apply to Plaintiff, as it was designed to protect junior creditors against post-petition interest claims from senior creditors, and not senior lenders in an intercreditor dispute. The Court disagrees. Certainly, courts—and particularly those applying equitable bankruptcy principles—have demonstrated a concern for protecting junior creditors' expectations that senior claims will stop accruing when the debtor files for bankruptcy. See, e.g., Kingsboro II, 514 F.2d at 401. However, the Southeast II holding does not cabin itself to protecting *only* junior creditors' expectations, but the legitimate expectations of any party that, absent an explicit agreement to the contrary, interest stops accruing on the date of the petition. See Southeast II, 93 N.Y.2d at 186, 688 N.Y.S.2d 484, 710 N.E.2d 1083 ("[T]he Rule of Explicitness safeguards reliance by parties on the analogous general rule that creditors are not entitled to post-petition interest in bankruptcy proceedings absent

express language to that effect in subordination agreements ordering priorities among the contracting parties.").

■ A subordination agreement is "simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another." In re Coronet Capital Co., No. 90 B 13646 (FGC), 94 Civ. 1187 (LAP), 1995 WL 429494, at *4 (S.D.N.Y. July 20, 1995) (quoting In re Best Products Co., 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994)). To be sure, it is often the case that junior creditors agree to subordinate their entire claims to those of senior creditors. But the facts here are somewhat unusual: rather than a junior creditor agreeing to subordinate its whole claim to a senior creditor, this case involves whether the Parties have agreed to subordinate the repayment of outstanding principal to claims of post-petition interest, in which both have a stake.[8] It would make little sense to hold the Parties to different drafting standards depending on their position relative to the debt, particularly when the Documents themselves seek to clarify these positions.

In adopting the Rule as a principle of New York state contract law, the Court is mindful that, even before the Southeast II ruling, it has been the longstanding policy in this Circuit to embrace the Rule of Explicitness, both pre-Code and post-Code. Thus, while there is no dispositive precedent on the facts here, the Court is hesitant to depart from a trend maintained continuously across time and legal contexts. To date, the Rule has been evoked as an equitable principle in federal common law pre-Code, see Kingsboro II, 514

F.2d 400, a principle of apparent statutory interpretation post-Code, see Ionosphere, 134 B.R. 528, and now a principle of New York state contract law. See Southeast II, 93 N.Y.2d 178, 688 N.Y.S.2d 484, 710 N.E.2d 1083. Isolating a single context in which the Rule does not apply—that is, in federal non-bankruptcy proceedings interpreting contract provisions that expressly contemplate the impact of bankruptcy—would have the same unwieldy effect on commercial debt that the Southeast II court sought to avoid.

Thus, the Court finds that the Rule of Explicitness applies in the instant proceeding.

### B. Application of the Rule to the Financing Documents

Having decided that the Rule of Explicitness applies, the Court must next decide whether the Financing Documents are sufficiently explicit to satisfy the Rule.

■ The Rule of Explicitness requires that, "before a right to 'post-petition' interest and a concomitant reduction in dividends to subordinated creditors may be recognized, 'the agreement should clearly show that the general rule that interest stops on the date of the filing of the petition is to be suspended, at least vis-a-vis these parties.'" Kingsboro I, 379 F.Supp. at 231 (quoting Time Sales, 491 F.2d at 844). The contract must contain "precise, explicit and unambiguous language ... to the effect that the contract abrogates the general rule regarding interest." Kingsboro I, 379 F.Supp. at 231. Contracts that do "not explicitly refer to post-bankruptcy interest" often fall short.

---

8. Indeed, while subordination agreements often reorganize the priority of debt that otherwise would result in a pro-rata distribution among unsecured lenders, see In re 500 Fifth Ave. Assocs., 148 B.R. 1010, 1019 (Bankr. S.D.N.Y. 1993), here, a pro-rata distribution would result if the right to post-petition interest were recognized, while a refusal to recognize post-petition interest rights would result in the distribution of the funds to only one tranche of lenders.

Kingsboro II, 514 F.2d at 401; see also Ionosphere, 134 B.R. at 534. Thus, courts consistently find that provisions simply providing that junior debt is subordinated until senior debt is "paid in full" are insufficient. See, e.g., Kingsboro I, 379 F.Supp. at 231; Southeast I, 156 F.3d at 1120 ("[G]eneral language in the subordination agreement, establishing that the senior debt must be 'paid in full' before payment on the junior debt, was insufficient to alert the junior creditor that it had agreed to subordinate its claims to the senior creditor's claims for post-petition interest."); Time Sales, 491 F.2d at 842.

■ Both Parties here agree that section 3.04(f) of the Intercreditor Agreement governs the order of distribution of the proceeds. Plaintiff claims that this section must be interpreted with reference to section 3.04(c) of the Credit Agreement, which specifically states that Lenders "shall be entitled to receive post-petition interest during" an insolvency proceeding. (CA § 3.04(c).) Defendant, on the other hand, argues that because section 3.04(f) of the Intercreditor Agreement does not itself expressly mention "post-petition interest," it is insufficiently explicit; in addition, Defendant claims that because, under section 3.04(c) of the Credit Agreement, post-petition interest is only available "to the fullest extent permitted by law"—and because bankruptcy law would bar a claim for post-petition interest in these circumstances—Plaintiff is not entitled to post-petition interest under the Documents.

■ It is clear that section 3.04(c) of the Credit Agreement, which defines when interest is "due and payable," is incorporated by reference into the Intercreditor Agreement. Along with the commonplace

rule of construction that terms in a contract must be assumed to have the same meaning throughout, see Maryland Cas. Co. v. W.R. Grace and Co., 128 F.3d 794, 799 (2d Cir. 1997), both the Credit Agreement and the Intercreditor Agreement are explicit that the Documents are subject to the same interpretive principles, see IA § 1.01, and that terms for which meanings are provided in the Credit Agreement carry the same meaning in each Financing Document. (CA § 1.02.) Moreover, section 3.04(f) prioritizes interest that is "due and payable ... under the Financing Documents," which is specifically defined to include both the Intercreditor Agreement and the Credit Agreement. Thus, when section 3.04(f) prioritizes interest "due and payable ... under the Financing Documents," section 3.04(c) of the Credit Agreement operates to define when interest becomes "due and payable" under the Documents.

Defendant neither strongly disputes this nor contends that the Financing Documents are intended to be read in isolation from each other. Instead, Defendant claims that the language "to the fullest extent permitted by law" in section 3.04(c) creates an ambiguity unacceptable under the Rule of Explicitness. Defendant argues that the "law" referred to is bankruptcy law, which would bar Plaintiff's claim for post-petition interest unless Bionol were solvent or the Lenders oversecured.

The Court disagrees. Bankruptcy law does not apply here, and so does not ipso facto permit or bar any claims in this proceeding.[9] While this result certainly may have been different in a bankruptcy proceeding, the applicable law here, as set forth in the Parties' agreement, is New York state contract law. Defendant cannot

9. Indeed, because bankruptcy law, by its own operation, would allow a claim for post-petition interest where the debtor was solvent or

the lenders oversecured, there would be little need for the Parties to contract for this result.

manufacture an ambiguity by importing bankruptcy principles that are inapplicable to the instant litigation.

For this reason, the Court finds Defendant's analogy to the contract in Ionosphere inapposite.[10] In Ionosphere, the district court found the contract insufficiently explicit where it authorized senior creditors to receive "all amounts *owing* on the First Certificates (including post-petition interest)." 134 B.R. at 534 (emphasis added). The court reasoned that because the debt was undersecured—and so post-petition interest not "owing" under bankruptcy law—"it could be argued" that the interest was not owing under the contract, either. Id. at 535. Ionosphere is distinguishable for the simple reason that it was a bankruptcy proceeding, where bankruptcy law clearly determines which debt is owing. That is not the case here.

Moreover, unlike the Documents here, the contract in Ionosphere failed to specify that post-petition interest would remain due after the commencement of a bankruptcy proceeding, and regardless of whether it was allowable as a claim in such proceeding. The significance of this language was underscored by the Ionosphere court, which cited the following indenture provision "[a]s an illustration of explicit language" that might satisfy the Rule:

> Upon any distribution to creditors of the Company in a liquidation or dissolution of the Company or in a bankruptcy . . . holders of Senior Debt shall be entitled to receive payment in full of all Obligations with respect to the Senior Debt *(including interest after the commencement of any such proceeding at the rate specified in the applicable Senior Debt, whether or not such interest is an allowable claim in any such proceeding )* . . .

Id. at 535 n.14 (emphasis in original).

The language in the Documents here closely mirrors this sample provision. The definition of Obligations in the Credit Agreement—which is expressly "incorporated by reference" into the Intercreditor Agreement and recited as one of the Parties' basic agreements, see IA Preamble; IA § 2.01—includes

> interest and fees that accrue *after the commencement by or against the Borrower of any Insolvency or Liquidation Proceeding . . . regardless of whether such interest and fees are allowed claims in such proceeding.*

CA Ex. A at 27 (emphasis added). Section 3.04(c) similarly provides that interest is due and payable "regardless of whether an Insolvency or Liquidation Proceeding exists in respect of the Borrower." CA § 3.04(c).

The language in these provisions also hews closely to the language in the American Bar Association's ("ABA") Model Indentures, which were published in 1983 and 1999 in order to provide "an example of the type of explicit language that would prioritize post-petition interest." See K.-V., 496 B.R. at 335–36 (quotation marks and citation omitted). The 1983 Model Indenture's clause provided that before repay-

---

10. For the same reason, the Court does not find its decision at odds with In re Tribune Co., 472 B.R. 223 (Bank. D. Del. 2012), a Delaware bankruptcy court case relied on heavily by the Defendant which is, in any case, nonbinding on the Court. The language in the contract in Tribune provided for "interest accruing after the filing of a petition initiating any proceeding pursuant to any Federal bankruptcy law . . . but only to the extent allowed or permitted to the holder of such Indebtedness of the Company against the . . . insolvency estate of the Company in such proceeding." Id. at 251. The Court does not disagree that a contract that only provides for interest where permitted "against the . . . insolvency estate . . . in such proceeding" does not, in the context of a bankruptcy case, unequivocally provide for the accrual of interest otherwise disallowed in the proceeding.

ment on subordinated debt, "'holders of Senior Debt shall be entitled to receive ... interest (including interest accruing after the commencement of any such [insolvency] proceeding),'" Id. at 335 n.3 (citing ABA, Model Simplified Indenture § 11.03, 38 Bus. Law. 741 (1983)); the 1999 Model Indenture likewise defines debt as "including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company, whether or not a claim for such post-petition interest is allowed in such proceeding." ABA, Model Simplified Indenture § 1.01, 55 Bus. Law. 1115 (2000); see also Southeast I, 156 F.3d at 1124–25.

The Documents here both (1) define the Parties' obligations as including interest accruing after Bionol's bankruptcy proceeding and regardless of its status as an allowed claim in such proceeding; and (2) define interest as due and payable regardless of whether Bionol has declared bankruptcy, specifically including post-petition interest. Thus, under the model language provided in either Ionosphere or the Model Indentures, the Documents are sufficiently explicit to provide for post-petition interest. That these definitions are reiterated in two separate provisions in the Documents strengthens, rather than weakens, the conclusion that the Parties did not intend to define interest liabilities by reference to their (here, purely theoretical) status as an allowed claim in bankruptcy.

Nevertheless, Defendant contends that because section 3.04(f) does not itself mention post-petition interest, it is comparable to the contract provision that failed in Kingsboro I. (Def.'s MJP at 14.) Kingsboro I did not involve a multi-part contract

where interest is defined in one provision and the priority of interest payments set forth in another. The reason the contract failed in Kingsboro I was because, unlike the Documents here, it did not mention post-petition interest at all. See Kingsboro I, 379 F.Supp. at 231 ("[T]his Court can not view the provisions contained in the subordination agreement, which are to the effect that no payment shall be made to the subordinated creditors 'unless and until all principal and interest on all Senior Debt shall have been paid in full,' when taken in a context of specific reference to 'bankruptcy proceedings', as sufficiently clear and explicit.").

Ionosphere, however, involved a similarly-structured contract, which defined the debt as including post-petition interest in one provision and set forth the mechanisms of subordination in another. See 134 B.R. at 534. Contrary to Defendant's position, the Ionosphere court had no trouble arriving at the conclusion that "while [the subordination provision] does not contain the words 'post-petition interest,' this term is incorporated into the section through the use of the defined term 'Senior Certificates.'" Id. Here, too, the Court does not find that the need to incorporate a defined term into section 3.04(f) renders the provision insufficiently explicit.

Defendant's final argument is that the Documents are ambiguous because section 3.04(c) defines the Lenders' rights against the debtor, and not, it claims, vis-à-vis each other. In Kingsboro II,[11] the court found its conclusion that the contract was insufficiently explicit reinforced by the fact that the subordination agreement was, by

---

11. Defendant claims that the provision in Ionosphere failed because it defined the rights of creditors against the debtor, and not against each other. (Def.'s MJP at 16–17.) To the contrary, the court in Ionosphere found that the indenture was "clearly an inter-creditor

subordination provision," a factor that weighed for, not against, explicitness. 134 B.R. at 534. The Court thus examines Kingsboro II, a case more relevant to Defendant's position.

its express terms, "for the purpose of defining the relative rights of the holders of Senior Debt on the one hand, and the holders of the Notes on the other hand, against the Company (the bankrupt) and its property." 514 F.2d at 401–02. The court held that post-petition interest was not recoverable out of dividends due to junior creditors "absent a structure of priorities among creditors by express provision in the subordination contract." Id. at 401.

The Financing Documents avoid this problem. Section 3.04(f) sets out a clear structure of priorities among the creditors, and not "against the bankrupt estate." Id. at 402. And while Defendant claims that section 3.04(c) cannot apply in the context of determining intercreditor priorities, the plain language of 3.04(f) provides that interest is prioritized to the extent that it is "due and payable . . . under the Financing Documents," including the Credit Agreement. Unlike the contract in Kingsboro II, section 3.04(c) includes no language limiting its application to claims against the bankrupt estate. Thus, there is nothing to preclude section 3.04(c) from defining which interest is prioritized under section 3.04(f).

Defendant correctly points out that, unlike in the general contract interpretation context, a finding of ambiguity here would result in judgment to the Defendant rather than an investigation into the Parties' intent. See, e.g., Ionosphere, 134 B.R. at 535–36. The Court need not reach this stage. The Documents expressly state that interest includes post-petition interest, and twice specify that interest is due regardless of whether Bionol is in bankruptcy. Even accepting Defendant's interpretation—that the Parties only intended for post-petition interest to be paid when "permitted by law"—this is not a bankruptcy proceeding, and the only law preventing

such a payment at this juncture is the contractual analysis performed by the Court. Thus, the Court finds that the Documents, as a whole, put the Lenders on clear notice that the repayment of principal could be subordinated to superior claims for post-petition interest. As such, they satisfy the Rule of Explicitness.

### C. Plaintiff's Entitlement to Fees

The Parties' final dispute concerns whether, under the Intercreditor Agreement, Plaintiff is entitled to fees and expenses, including the attorneys' fees it incurred in filing this action. Plaintiff claims that it is entitled to fees under section 3.04(f)(i) of the Intercreditor Agreement, which grants the highest priority to "Fees, costs and expenses then due and payable under the Financing Documents or the Tranche TEX Loan Documents." (IA § 3.04(f)(i).) Defendant claims that Plaintiff is not entitled to fees or expenses because it cannot prevail on the underlying claim and because fees are subject to the same Rule of Explicitness as post-petition interest.

The New York Court of Appeals's decision in Southeast II was specifically about post-petition interest, and did not hold that the Rule applied equally to claims for the fees and costs incurred in recovering such interest. Nevertheless, under New York law, "the court should not infer a party's intention to provide counsel fees as damages for a breach of contract unless the intention to do so is unmistakably clear from the language of the contract." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003) (quotation marks omitted). Even then, such a provision "should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered under

the contract." Id. (quoting Tokyo ·Tanker Co. v. Etra Shipping Corp., 142 A.D.2d 377, 380, 536 N.Y.S.2d 75 (1st Dep't 1989)). Moreover, "a general contract provision for the shifting of attorneys' fees does not authorize an award of fees for time spent in seeking the fees themselves." F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1266 (2d Cir. 1987). Thus, even if the Rule of Explicitness does not apply to the recovery of attorneys' fees in this matter, the Court could not award them unless the agreement, through "express language," evinced an "unmistakable intention" to provide them to a prevailing party. Oscar Gruss, 337 F.3d at 199 (quotation marks and citations omitted).

█ Plaintiff primarily bases its argument on section 3.04(f) of the Intercreditor Agreement, the same waterfall provision under which it claims entitlement to postpetition interest.[12] (Pl.'s Reply at 15.) Unlike the interest provision, however, the Documents do not define when fees and expenses become "due and payable" under the agreement, and do not define "Fees" or "expenses" as including attorneys' fees.

The Credit Agreement defines "Fees"[13] to include, inter alia, "each of the fees payable by the Borrower for the account of any Lender or Agent pursuant to section 3.13," CA Ex. A at 17; section 3.13 of the Credit Agreement in turn specifies the rates of unused line of credit fees that Bionol must pay to the various Lenders. (See CA § 3.13.) Section 2.09 of the Credit Agreement, on the other hand, states that section 3.13 does not apply to the Tranche TEX Loans, and that the "corresponding provisions" in the Tranche TEX Loan Documents apply in lieu thereof—except that the Tranche TEX Loan Documents are "in all cases ... subject to" the Intercreditor Agreement. (See CA § 2.09(b).) Despite this instruction, there is no section 3.13 in any of the Tranche TEX Loan Documents, and no corresponding provision labeled "Fees."

Plaintiff claims that its entitlement to fees is underscored by section 9.04 of the Bond Indenture[14] and sections 2.15[15] and

---

12. It is unclear to the Court whether Plaintiff is seeking fees and expenses in addition to those incurred in the instant proceeding. Neither the pleadings nor the short section in Plaintiff's reply brief devoted to this issue make clear if it is seeking such additional fees, and if so, what type of fees and on what basis. Thus, to the extent that this issue is in fact being raised, the Court declines to address it. See Am. Tissue Inc. v. DLJ Merchant Banking Partners, II, L.P., No. 03 Civ. 6913(GEL), 2006 WL 1084392, at *6 (S.D.N.Y. Apr. 20, 2006) (Plaintiff's "fail[ure] to address with any seriousness the legal sufficiency of" claims resulted in their dismissal); cf. Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); Schuh v. Druckman & Sinel, L.L.P., 602 F.Supp.2d 454, 465 n.7 (S.D.N.Y. 2009) ("Because this argument was made for the first time in the reply brief, we decline to consider it." (citing ABN Amro Verzekeringen BV v. Geologistics Ams., Inc., 485 F.3d 85, 97 n.12 (2d Cir. 2007)).

13. "Fees" is fully defined as "the Project L/C Fees and each of the fees payable by the Borrower for the account of any Lender or Agent pursuant to Section 3.13 (Fees)." (CA Ex. A at 17.) Neither party mentions this definition in their briefs; nonetheless, "Fees," as defined, appears to include neither attorneys' fees nor any type of fees that might be recoverable in this proceeding. "Expenses" is not defined, either in the Documents or by the Parties.

14. Section 9.04 of the Indenture provides, in relevant part, that the Trustee ... shall be entitled to such compensation as shall be agreed in writing with the Company for their services rendered hereunder ... and to reimbursement for their out-of-pocket expenses (including reasonable counsel fees and expenses) reasonably incurred in connection therewith

7.05 [16] of the Bionol Loan Agreement, all of which discuss the circumstances in which Plaintiff may be compensated, reimbursed or indemnified by Bionol. However, section 3.04(f)(i) of the Intercreditor Agreement does not refer to indemnification, reimbursement or compensation; more importantly, Plaintiff here is not seeking indemnification from a liability incurred in connection with the performance of its duties as a successor Trustee.

Although Plaintiff is not claiming entitlement under section 10.06 of the Credit Agreement, Defendant points out that this section requires Bionol to pay the fees incurred by any Lender in enforcing its rights under the Documents, and those incurred by Defendant in "administrat[ing]" and "protect[ing]" its rights under the Documents. (CA § 10.06.) Like the sections in the Loan Agreement relied on by Plaintiff, this section describes *Bionol's* reimbursement duties, and not those of the other Lenders. Grafting Bionol's reimbursement duties onto the meaning of "expenses" within section 3.04(f)(i) in a way that allows for the repayment of fees incurred by either Party in an intercreditor dispute is, in all likelihood, outside the intended scope of the priority provision.

Accordingly, the Documents do not make it clear, as they must, that the "due and payable" expenses described in section 3.04(f)(i) include those incurred by a Lender in litigating the priority of post-bankruptcy distributions. At least on the facts before the Court, the Documents are not sufficiently explicit to require the Defendant to apply the proceeds to the fees incurred by Plaintiff in this litigation.

## IV.  CONCLUSION

For the reasons outlined above, the Court GRANTS in part and DENIES in part both Motions for Judgment on the Pleadings. The Court GRANTS Plaintiff's application for a declaratory judgment that it is entitled to post-petition interest under the Financing Documents, but DENIES its application for fees and expenses incurred in the instant litigation.

SO ORDERED.

.  .  .  .

[I]n each instance in which this Indenture shall provide for compensation, reimbursement or indemnification of the Trustee, such provision shall be deemed to provide for ... the payment of all related fees, cost, charges, advances, and reasonable expenses of the Trustee (including, without limitation, reasonable attorneys' fees and expenses).

15.  Section 2.15 provides that Bionol agrees to indemnify and reimburse the Trustee for costs, attorneys fees and expenses "incurred in connection with investigating, defending against or otherwise in connection with any such losses, claims ... damages, liabilities, expenses, or actions."

16.  Section 7.05 provides that if Bionol defaults, Bionol will reimburse the Trustee for fees and expenses incurred to collect payments due under the agreement.